## WESER BROS., Inc., v. PAUL.

(District Court, S. D. New York. October 17, 1921.)

### No. 18145.

1. Patents ⟜328—923,225, for player piano, held valid and infringed.

   The Weser patent, No. 923,225, for player piano, *held* not anticipated and valid, and claims 1, 2, 4, 5, and 26 infringed.

2. Patents ⟜178—Description of preferred construction not limitation.

   The description in a specification or drawings, or even in a claim of the form or construction of a mechanical element, when that form or construction is not essential to the invention, is to be taken merely as a preferred form or construction, and not as a limitation which excludes mechanical equivalents.

In Equity. Suit by Weser Bros., Inc., against Charles W. Paul. Decree for complainant.

Edmonds & Peck, of New York City (Philip C. Peck, of New York City, of counsel), for plaintiff.

Otto Munk, of New York City (Latimer P. Smith and Robert M. Barr, both of Philadelphia, Pa., of counsel), for defendant.

KNOX, District Judge. [1] Plaintiff is the owner of United States letters patent No. 923,225, issued June 1, 1909, to John A. Weser, now deceased, for a mechanical musical instrument.

Referring to the specifications, and taking some liberties therewith, it is seen that the patent relates generally to automatic pianos or other musical instruments in which power for operating the various mechanical parts of the instrument is derived from feeder bellows. Particularly it is concerned with the devices by which expression—that is, a variation in tone—is controlled, either directly or indirectly, and with the connections therefor.

The feeder bellows of instruments of this general character have been operated in some instances by electric motors; in others by foot power. Weser desired to combine both the motor-operated bellows and the foot-power bellows, inasmuch as the use of the latter in supplement of the former would enable the matter of expression to be better controlled. He also wished to make the action of the foot-power bellows to a certain extent independent of the action of the motor-operated bellows, so that the function of the foot-power bellows, as an expression device, could be fully realized.

To do this Weser took a piano in which the exhaust or vacuum pressure is created in the main bellows by feeders operated by pedal mechanism, and installed therein a motor-operated means of creating exhaust or vacuum pressure. Such means consisted of a series of small or supplementary feeder bellows operated by a crank shaft, pulleys, and a belt from an electric motor.

The supplementary bellows were connected by a suitable windway with the wind chest, and, through that and its connections, with the playing devices of the mechanism. At a convenient point between the motor-operated bellows and the connection to the wind chest he provided a check valve, comprising a simple flap valve, co-operating with the end of the windway, and opening towards the motor-operated bellows. The effect of this was that the motor-operated bellows would be in operative connection with the rest of the mechanism only when its exhaust or vacuum pressure was greater than that in the windchest, while, if the exhaust or vacuum pressure produced by the foot-operated bellows should be greater than that produced by the motor-operated bellows, the check valve above referred to would immediately close and cut off the motor-operated bellows, and the foot-operated bellows would draw no air therefrom. Thus the full effect of a strong or powerful action of the foot-operated bellows in accenting certain notes or in performing fortissimo passages would be unimpaired.

After proceeding at considerable length to disclose the other features of his invention, Weser embodied the same in 29 claims, 5 of which, to wit, Nos. 1, 2, 4, 5, and 26, are said to be infringed.

A summary statement of the claims here involved is:

Claim 1: (a) Playing devices; (b) foot-operated bellows in operative relation therewith; (c) independent motor-operated bellows, also in operative relation with playing devices, whereby notes may be accented by the foot-operated bellows, while the instrument is operated by the motor-operated bellows.

Claim 2: (a) Playing devices; (b) foot-operated bellows in operative relation therewith; (c) motor-operated bellows, also in operative relation with playing devices; and (d) means to cut off com-

munication between (b) and (c) when the working force of (b) exceeds that of (c).

Claims 4 and 5 embody the matter set forth in claims 1 and 2, respectively, with the addition that each includes a wind chest interposed between the playing devices of the piano, and in operative relation therewith, and also in operative relation with both the foot-operated bellows and the motor-operated bellows.

Claim 26 differs from claim 5 in that it includes as a separate element a "main or reservoir bellows" in operative relation with both foot-operated bellows and the independent motor-operated bellows.

The basis of plaintiff's claim of infringement is that defendant accomplishes the purpose served by Weser's invention through the medium of what is called "the Aerex player piano power plant." It consists of a motor which operates at high speed a centrifugal suction fan horizontally disposed in the upper portion of the motor housing. The function of this is that it draws air from the bellows and wind chest of the piano, and thence through the motor, in such fashion as to create a normal air tension, which actuates the playing devices of the instrument. By reason of this, plaintiff asserts, it may properly be said to be the "motor-operated exhaust or vacuum pressure-creating means" of the Weser patent; that is, the exhaust fan of the Aerex motor serves a purpose identical in function and result with that of Weser's series of small or supplementary bellows, operated through the medium of a crank shaft, pulleys, and belt from an electric motor.

Another alleged point of similarity of the Aerex motor to Weser's device, and so close thereto as to amount to infringement, is the valve contained in the housing of the Aerex motor. This consists of a leather disc positioned at the mouth of the motor housing and just below the end of the windway through which the revolving fans draw air from the wind chest and bellows. Under defendant's construction, as shown in Plaintiff's Exhibit 9, the windway consists of a piece of rubber hose.

The valve just mentioned is so constructed that when the exhaust or vacuum pressure created by the operation of the foot-operated bellows of the piano is greater than that created by defendant's revolving fans it will be drawn up against the end of the windway, and thus prevent any air being sucked from the motor housing. During the period that the valve responds to the pressure of the foot-pedaled bellows the latter is to a certain extent independent of the action of the motor-operated bellows, and the function of the foot-operated bellows, as an expression device, can be fully realized. Once, however, the person at the piano ceases to pedal, or otherwise lightens the exhaust or vacuum pressure of the foot-operated bellows to a point less than that created by defendant's fans the valve at the mouth of the motor housing drops down, and the normal air tension attributable to the fans again comes into action. So again, says plaintiff, there is a demonstration of infringement, for the valve "constitutes the means to cut off communication between the foot-operated bellows and motor-operated bellows when the working force of the former exceeds that of the latter," and that the Aerex motor is "in

operative relation with the playing devices," "the wind chest" and the "main or reservoir bellows" of the Weser combination.

In view of the identity of purpose, function, and result served by the devices of the respective parties the main question to be determined is whether the separate Aerex suction fan is the mechanical equivalent of Weser's "independent motor-operated bellows" set out in the claims here involved.

Defendant does not deny that a fan is a mechanical equivalent of a bellows when each is considered as a separate unit, and, further, it is not denied that a fan is the equivalent of a bellows where each forms a part of a combination of elements, assembled and functioning in the manner of the devices here in suit. What would ordinarily be the logical result of the practical admissions thus made is sought to be avoided upon the ground that the disclosure of Weser is of a secondary character, and, as such, the elements entering into his combination should not be accorded a broad range of equivalents. In this connection attention is called to the fact that the language of the claims of the Weser combination is limited to a "foot-operated bellows" and to a "motor-operated bellows," and that there is nothing in the patent whereby it can be suggested that he ever contemplated the possibility of any other construction.

It is further argued that, should the court apply to the claims of Weser's patent the doctrine of equivalents, the result would be to so widen their scope as to render them invalid under the patent to Fuller, No. 601,318, March 29, 1898, and also under the alleged prior use of the Bougher organ.

Giving attention first to the question as to whether Weser had in mind any other structure of a motor-operated exhaust or vacuum pressure-creating means, it will be seen that he used in his specifications this language:

"In addition to the exhaust or vacuum pressure-creating means to be operated by the performer there is also provided a motor-operated exhaust or vacuum pressure-creating means represented in the present instance by a series of small or supplementary feeder bellows operated through the medium of a crank shaft, pulleys, and belt from an electric motor."

When drafting his claims and in describing the device just referred to, Weser used the words "motor-operated bellows;" none the less, he undoubtedly was aware that the same function and result might be obtained by means of an exhaust fan. He was familiar with the organ art, and exhaust fans had long before been used as a means of creating air tension in pipe organs. In saying that the pressure-creating means was "represented in the present instance by a series of small or supplementary feeder bellows" he probably meant that he preferred the bellows type of means, and did not intend to exclude equivalent means.

[2] At this point it is to be borne in mind that the description in a specification or drawing of a form or construction of a mechanical element when that form or construction is not essential to the combination or improvement claimed is a mere pointing out of the best mode in which the patentee contemplated applying the principle

of his invention under section 4888, Revised Statutes (Comp. St. § 9432), and does not deprive him of protection against mechanical equivalents, nor indicate that he gave up all other modes of application. J. L. Owens Co. v. Twin City Separator Co., 168 Fed. 259, 93 C. C. A. 561.

And in Vrooman v. Penhollow, 179 Fed. 296, 102 C. C. A. 484, it was held that, where a claim of a patent contains a description of only one form of a thing which would perform the same office in other forms, the court will apply the general rule that the description covers all equivalent forms, and the form described will be treated only as the one preferred.

Conceding now, as must be done, that Weser's patent was not revolutionary in character, it is not, for such reason, to be deprived of the right of a fair range of equivalents. The Supreme Court expressly held in Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U. S. 405, 28 Sup. Ct. 748, 52 L. Ed. 1122, that the doctrine of equivalents may be invoked for all patents, and not merely for pioneer ones, and that the range of equivalents depends upon and varies with the degree of the invention.

While Weser did not make a great invention, he did succeed in taking a forward step. Apparently his application encountered no serious obstacles in going through the Patent Office. The file wrapper not being in evidence, it is impossible to say just what it contains. I am, however, justified in assuming that, if the file wrapper contains any evidence of Weser's having been compelled to limit or qualify his original claims in any material respect, such fact would have been called to my attention.

In addition, it is established that since 1907 plaintiff has made and sold 489 player actions equipped with Weser's patented improvement, and involving about $143,000. Not a particularly large number of instruments, to be sure, but sufficiently large to entitle the business to reasonable protection.

Having come to the foregoing conclusions, it is necessary to say definitely whether defendant's Aerex motor power plant is the equivalent of complainant's series of small motor-driven bellows. That the two devices perform the same function and achieve the same result must be conceded. In order to find equivalency it remains to be decided if they function in substantially the same manner. Benbow-Brammer Mfg. Co. v. Straus, 166 Fed. 114, 92 C. C. A. 98. The means in each instance is that of the creation of vacuum pressure, and at the time of Weser's patent the creation of such pressure by a motor-driven exhaust fan and in a musical instrument was well known and understood. See patent to Fuller, No. 601,318, March 29, 1898. I hold, therefore, that defendant's device is the mechanical equivalent of Weser's improvement.

Are, then, the claims in suit invalid or to be limited by reason of the patent to Fuller and the alleged prior use of the Bougher organ?

As to the alleged prior use of the organ mentioned, it is to be admitted that the valves in its windway, and their apparent mode of operation, are not unlike those called for by Weser. Nevertheless I

am unable to understand how it was, if the organ was connected with a one horse power motor, a person of ordinary strength could overcome the air tension thus created by the operation of an organ's foot bellows. From this fact I am inclined to believe that, when Mr. Bougher used only the foot bellows in playing the organ, he must have so manually manipulated the check valve as to shut off the air tension created by the fan. Indeed, Mr. Anchor, who first installed the organ, says that the foot bellows could be used for accenting notes only "if that [the foot bellows] develops more power by foot than the motor gives." Further, if there was an anticipation of Weser in the use of this organ, proof of the fact should not depend upon the somewhat meager testimony now in the case as to how the organ's note-accenting capacity was utilized. The organ was built by the "Clough-Warren" people of Adrian, Ohio. This concern is now in the player piano business, and if, in the organ trade formerly carried on, it developed all that Weser claims to have accomplished, indisputable evidence thereof would probably be available. It is possible, of course, that the witness who testified that the organ was equipped with a one horse power motor may be mistaken. In view, however of the testimony of Winfield S. Weser that he could not play the organ with its foot pedals while the motor at present attached to the organ was operating, I am not disposed to find the alleged prior use of the organ to be established.

Referring now to the Fuller patent of March 29, 1898, for a regulator for organs having electrical air pumps, it is to be marked that this patent is in the case not as an anticipation, but merely as showing the state of the art, and to aid in construing the claims of the Weser patent. It cannot, therefore, invalidate any of the claims on the ground of want of novelty. Grier v. Wilt, 120 U. S. 412, 419, 7 Sup. Ct. 718, 30 L. Ed. 712.

Fuller recites:

"Heretofore organs, both reed and pipe, have been operated to produce music by an air-forcing pump consisting of a rotary fan blower, the fan of which has been driven by direct connection with an electric motor, and reed organs have been operated by an exhaust or suction pump wherein an exhausting fan blower has been driven by direct connection with an electric motor. In such cases the wind conductor, in which the fan blower is located, has been connected with the wind chest or vacuum air chamber of the organ."

The object of the invention was "to control, at the will of the organist, the volume of the air current created by the fan blower between the air chamber of the organ and the mouth of the wind conductor in which the fan blower is located, in order that the air current may be properly regulated in accordance with the varying musical requirements of the organ, and also in order that the consumption of electrical power may be proportioned to the volume of tone actually produced."

When the improvement should be in use, Fuller contemplated that the electric current to the motor should always be turned on to drive the motor at its maximum speed, and the regulation was to be entirely controlled by his manual mechanical regulator. By simply mov-

ing the regulator the volume of the air current might be regulated to meet the musical requirements of the organ, and at the same time the "load" upon the motor would be lightened to a point beneath its maximum "carry" and the consumption of electrical energy thereby proportioned to the work done.

As I understand this paraphrase of a portion of Fuller's specifications, it means that he had in mind the lessening of air tension, not an increase thereof. He does, however, go on to say:

"When the bellows, B, is used alone, the wind conductor, E, is closed by the regulator. The bellows, B, it may be remarked, can be used simultaneously with the air pump."

Notwithstanding this statement, I have difficulty in finding that Fuller had in mind such an operative relation between the various elements of his combination as would permit of an accenting of notes by means of the foot bellows while the instrument was being operated by the motor-driven fan. I would think that before the foot-operated bellows could be fully utilized as an accenting device it would be necessary to entirely close the wind conductor by the hand-operated regulator; otherwise the foot bellows, being in operative connection with the windway, would tend to minimize the air tension being created by the motor-driven fan; that is, a counter suction would be set up. That such would be the effect seems to be indicated by what Weser says upon this subject at lines 20 to 25 on page 2 of his patent.

For these reasons, I shall not limit Weser's claims upon anything found in the patent to Fuller, and will hold the claims in suit to be valid and infringed.